Honorable Justices, Treva Hearn on behalf of the plaintiffs and the appellants. I have to ask clarification before I start. The decision or the second part of this appeal, which was the sanctions, was not opposed. I can argue that, but it would appear to me that it could be submitted without further argument. I guess we'll see. Yeah. The district court expressly found that environmental alternatives Counsel, everything's on the table, so if you want to argue it, argue it. If you don't want to argue it, don't argue it. Use your time as you will. Thank you, Your Honor. The district court expressly found that in the case of environmental alternatives, that it was a foster family agency, that it recruits and certifies foster family homes in Lassen County, that it conducts background checks of prospective foster parents, that it verifies that homes are safe and acceptable for placement of foster children, that it conducts training of prospective foster parents, that it provides professional support to foster parents, that it conducts visits to foster homes to ensure that the needs of the foster parents and the foster children are met, and finally, that it conducts visits to ensure that continued placement in a particular home is in the best interest of the foster parents and in the best interest of the foster children. These were the findings of the district court in his decision. When the district court made those findings, I believe that it found the basis for the duty. However, the court then took the unusual route of looking at premises liability and determining that it had to decide foreseeability with regard to whether or not there was a duty. Well, don't you have to show breach of a duty caused the damage? And that seems to me you have to be able to show that EA knew or should have known that Mr. Coy was a molester. I don't believe so. I believe that the case law does not apply with regard to premises liability. Let's say we agree with you. Let's just take ordinary negligence. Let's say that there's a we agree with you that there's a special duty. You still have to show causation, right? Yeah. Getting back to Judge Carney's question, that seems to be the question in front of us. I don't think anybody argues there's no duty at all. And I think from listening to you, you seem to be arguing there should be strict liability, which isn't the case. No, no. So let's say there's a duty. What's your best evidence in the record that there was a breach of the duty? The best evidence in the record that there was a breach of the duty is, number one, that any renewal of the certification of that home did not require the medical status of the foster parents. Secondly, it's not just the recertification of the home and the pre-placement understanding of what was going on, but the placement, the placement itself. It's obvious that environmental alternatives was present and had a social worker present during the placement. And the best evidence that there was notice that something was not going well was there were red flags about one month before the removal of those children in that one of the children was spitting and kicking, and they admitted, their social worker admitted that that's a sign of molestation.  Number three, that any time, and this is, again, where not strict liability because it wasn't pled, and I understand that, but the fact that it goes to the negligence and that there's a mandatory requirement, that reporting of any kind of belief that there's molestation or any sexual abuse or abuse is required, and this was a mandatory reporter. And finally, there was an admission by the social worker that she had determined that the signs she was seeing were that there was molestation or the kind of thing you would expect with sexual abuse, and she determined at that point, well, it had to have happened earlier or it must have happened earlier. That wasn't a decision that she should have made, and that's what goes to the negligence. That's what goes to the negligence. She had a requirement to report that and not make a decision, I don't have to report it because she needed to report it. That is the requirement of the statute, and she needed to report it within 24 hours. So aren't we getting right down to the question of the significance of the spitting and kicking and so forth and whether that is a sign that people ought to, that triggers a duty to intervene? The social worker for environmental alternatives stated that in her training that was one of the signs. One of the signs. But I think the district court, if I'm reading the district court's opinion correctly, said, look, we need something more to establish foreseeability. We need an actual report of molestation. Isn't that the bridge? Is that the gap we have in this case between your view and the district court's? No, I believe that that was a decision for the jury because the fact that he determined that there was a duty and that we had a special relationship, it was then up to the jury to determine if their ordinary care was reasonable, because that is what is left in the purview or that is left to the trier of fact. And that's where the court took a side road and started deciding whether or not there was a duty because of the foreseeability of this inquiry. Well, I think we're talking the same thing. I mean, you argue that it was foreseeable that this would occur because of the kicking, biting and other signs. So I don't think you're disagreeing with the district court's approach. You just disagree with the way the district court looked at the evidence. Isn't that it? And, you know, I've argued this with myself for the last 48 hours. If we take the elements of premises liability and apply it to this case, we can't get down the road. We just can't get down the road, because this isn't a premises liability case. But it's a negligence case, and the same principles apply, whether it's premises, whether you're on the open sea, you know, whether you're in a foster care facility. Negligence is negligence, and the same principles apply in terms of duty, breach, causation, and approximate cost. Except the foreseeability issue is so different. When you have a parcel or a piece of property, what are you supposed to expect, given, you know, someone crashing through a fence intentionally and killing children? Those are the kinds of things you have to look at. But in this instance, they have insurance because they have a reasonable foreseeability that there will be improper sexual conduct in the record, 001069. That's why you have insurance on your property in case somebody, you know, comes onto your property and is injured. So do you have a specific case citation to support your argument that there is a different analysis, negligence analysis in this context? Yes. I believe in my briefing papers that I referred you to the J.L. case, which talks about, it's a child care case. It's a 2000. Right. But J.L. doesn't say to you, gentlemen, there's not a limited foreseeability element of negligence analysis. I mean, I agree with you, J.L. may be more apropos to this case on a premises liability theory, but I don't think it alters the basic way we look at negligence law. But who's making the decision about what is the reasonableness of the ordinary care that was taken? Is it the court that's making that decision, or is it the jury, the trier of fact? Because these are so fact-driven with regard to what was reasonable under these circumstances. I believe there's just no way that it could not have been a jury decision. And I believe that we, that the case law in the California Supreme Court tried to clear that up by saying, in the Weiner case, we're going to clarify this duty analysis. We're going to clarify it. That foreseeability in the context of determining duty is normally a question of fact for the jury. Normally. That's the part that makes it difficult for you, because that leaves open the question of the possibility that the court can decide, as a matter of law, there is no breach. Well, in which case, the court has to make a determination of the duty on a different ground, then. Because let's look at what was foreseeable with regard to this particular situation. Unfortunately, sexual molestation in the foster care scenario is something that is foreseeable, and that's why they insure against it. That's why they try to take, to deal with it. And just because the kind of injury that occurred was not foreseeable does not foreclose the fact that there could have been any kind of injury. If someone is going to say that. If we accept your argument, then that would mean every time there is a molestation in a foster care home, it automatically gets a jury trial. Is that your argument? My argument is that when they have breached the duty of care, and that they did not check the medical condition of the foster parents, I believe that standard of care being breached. How was failure to check the medical condition causally related to the molestation The admission of the foster mother was that the foster father was one year into Alzheimer's symptoms. So what would that have told them about his propensity to molest a child? But it's not the injury that we have to foresee. It is we foresee that there could be injury. And yes, one year into Alzheimer's, he could have forgotten and left them somewhere. He could be driving down the road and forget where he was. It's not the injury that occurred. It is that the risk of an injury occurring was there. And that, in the briefing papers also, there is case law in California that says what we are looking at is whether these children were or whether the situation was where they were dependent and they were vulnerable, then the risk, the risk of injury is greater. And it is with children. But it's a different risk. I mean, I think that's your problem. I think you basically are saying that the risk doesn't have to be related to the injury. And I'm not sure that that's permitted under causality theory of negligence. In other words, what you're saying is they wouldn't have put them in the foster home if they found out that he was perhaps one year into Alzheimer's. Correct. But there's no causal relationship between the risk of injury of that that's in the record that I can see and the risk of injury of what happened. And this is more parallel than the school situation. And there again, we have to look at the fact that we have the vulnerability and the dependence of the persons who are most at risk. Those children didn't have a choice whether it be in foster care. Those children were dependent upon the home. And so, therefore, it makes the ordinary care a different analysis. It makes the risk analysis different. And the school case that was cited in the briefing paper said it didn't necessarily matter that the injury that did occur was the injury that was for any kind of injury could have occurred because you were not watching those children in the afterschool program. And they were there. And they're sort of a captive. But in foster care, they're far more of a captive. And so the kind of injury that occurred does not have to be that was reasonably determined. I mean, just any injury. You're down to almost a minute. Do you want to reserve? Yes.  Good afternoon, Your Honors. Ronald Inabnit for Defendant and Appellee Environmental Alternatives. What I'd like to do is go back and revisit the Court's order to some extent. The Court applied the Roland v. Christian 1968 seminal multifactorial case to determine whether there was a duty that was owed to prevent that whether environmental alternatives owed a duty to plaintiffs to prevent a criminal assault by a third party. And this is the appropriate test to determine tort liability on whether a duty exists. I find it a little hard to, I guess, to understand why premises liability theory in its entirety can be imported into this situation. I grant you the general negligence principles. We all know those. But it's a whole different situation. And even in premises liability, you have different invitees. You have, I mean, it's a whole different theory. Right. The factual background of Roland was a premises liability case. But it's been used consistently since then to apply, to analyze whether a duty exists in a particular civil action. In my brief, I make reference to Witkin that establishes that. There's also the case of Juarez v. Boy Scouts of America. I don't believe that it was specifically cited in the briefs by other parties, but it's referenced in the Margaret W. case. Juarez was a case where the Court found that there was a duty by the Boy Scouts to prevent a particular harm, in this case sexual abuse. They did so by applying the Roland factors. There's another case that's referenced, I believe, in the J.H. v. Los Angeles Unified School District, which is Jennifer C. v. Los Angeles Unified School District. Again, a case where the Court found that there was a duty on the part of the school district to prevent a sexual assault. They did so by applying the Roland factors. So the eight-factor analysis is applicable in cases like this, regardless of whether it leads to a finding of a duty or a nonexistence of a duty. It is the appropriate standard. And although there are eight factors that apply, as the district court pointed out, the most important of them is foreseeability. And again, we get back to general negligence theory, so it doesn't really matter one way or another, does it? Well, I think just one distinction, Your Honor. I'm sorry. I mean, if, for example, you had this was a, you're a client. Put a child in a home of a convicted molester, I think you'd have a different case from your point of view, correct? Well, if we knew. You wouldn't say there's no duty. The duty still depends upon foreseeability. If there would be not a scintilla of evidence that the foster family agency was aware. Well, let's say he's convicted as a matter of public record. It might be hypothetical. It would be very. We should have known. We should have known, yeah. Precisely. If that information was reasonably available to it, then. It is. It's public. You have to register as public record. Don't fight on that. You know, you're going to shove us in the other direction if you fight on that. I mean, seriously. I mean, if you're saying, if you're taking the position that your client and similarly situated clients have no duty to ensure that you're not putting kids in convicted molester's homes, then I think you've got a really tough argument. Right. Of course, in this case, that isn't factually what we're asking. But we're asking you conceptually. Right. To help us with your argument. Right. And so the point that I think, I don't want to speak for Judge Thomas, but I think the point he's making is that the duty issue does not carry the day for you. Because whether or not there's a duty, you still have the, we still have to look at whether or not there was a breach of that duty and whether or not, you know, the EA is responsible ultimately for what happened to the child. I would not concede that point in its entirety. I would. What part do you concede? There is a duty, it depends what the duty. What was EA's duty in this case? Broadly speaking, the duty was to properly license the foster home, which they did. Their duty was also to make regular visits. Properly place. Properly place and then afterwards to monitor the placement. Okay. And the evidence is sufficient. Okay. So if they have a duty, if EA has, if it has a duty to properly place, and it placed a child in the home of a known sex offender, would you agree that there would be liability? Yes, if that information was reasonably available. I can concede that point. Why wouldn't it be reasonably available? It should be on the databases that are available to it. Right. Right. I think Judge Raulston said known, and you're saying, well, I don't know if we knew. You're fighting the hypothetical.  The reason I. But let me, if I could follow up just for a minute. I know you want to make another point. Right. But let's take, these kids were removed from their parents because the mother went away and the father, both parents were absent. That was the precipitating event, correct? Correct. All right. Let's assume that the agency knows that the husband in this case has Alzheimer's. And let's say the same fact situation occurs, that both parents are away, the father forgets, and there's an injury. Wouldn't you say that there is, that is reasonably foreseeable or arguably foreseeable? Under that scenario, I would concede that, Your Honor. All right. So their theory is this, that if you had known, if you had done the proper licensing, they wouldn't have been there in the first place. And therefore, I understand that we have, they may not have causality. But that's their causal link there. Their argument is this, is that she was, these are relatively elderly people by foster parent standards. She was disabled and he has the beginning of Alzheimer's, undiagnosed. You didn't check on their medical condition, place him there, and harm came. That's their argument, I think, putting the best gloss on it. For which there is no proof. For which there was no evidence presented. Right. I'm not, I'm just saying hypothetically, then. Where does that fall? We're trying to paint a little broader canvas here, so. Your Honor, if that was a legal theory supported by facts, that would give rise to a duty. And then the question is whether or not there was a breach. That is not what we are facing here. Your Honor, I would like to bring to your attention two cases that I think are controlling here. One of them is one that was referenced by counsel for plaintiffs. The J.L. v. Children's Institute case, which was referenced in our brief. This is very analogous to our case. It didn't deal with a foster family agency, but it dealt with a nonprofit organization that was in the business of placing families, placing children in daycare homes. In the facts of the J.L. case, there was a sexual assault that occurred by, I believe, a 16-year-old son of the operator of that daycare facility. Again, the defendant in this case was Children's Institute, which was the nonprofit that placed the children in that home where the assault occurred. The court found that there was no duty applicable to Children's Institute because the standard that it applied was one of actual knowledge of the 16-year-old's assaultive tendencies. The facts in that case revealed a complete lack of any evidence that the nonprofit, Children's Institute, was aware that that 16-year-old had any propensity to engage in assaultive behaviors. On that basis, the trial court, as affirmed by the appellate court, determined that there was no duty as a matter of law. Another case that I'd like to draw the Court's attention to was out of the second district, I'm sorry, the fourth district, Garcia v. W&W Community Development. This was a foster family agency case. It did not deal with sexual molestations, but it dealt with, ironically, very similar facts to this case in that the allegation was that the foster mother was infirm, that her faculties were beginning to deteriorate. The tragic facts of that case were that a 2-year-old drowned in a bathtub, and the allegation was that it was unattended. The child was unattended by the foster parent. In that case, the trial court, as affirmed by the appellate court, found no liability on the part of the foster family agency because it had an independent contract, a relationship between the foster parent and the foster family agency, which is precisely the situation we have in this case as well. The Coys were not our employees. At best, they were independent contractors. And that is an extremely significant fact when it goes to a ---- Roberts. Right. But that's the ---- I think the argument is different in this case. I mean, I realize the intersection of the arguments in part, but I think their argument, and I guess this is the point I was asking about, put in its best possible light is that your failure to certify placed the kids in an environment that turned out to have risks associated with it. And if you had done medical examinations and certification and done that properly, they wouldn't have been there and therefore not subject to the unknown risk. That would be a good argument if there were any facts to support it. There is not a scintilla of evidence. Well, did you do any medical examinations? Of the ---- there's no evidence that we had a duty to do that. However, what they're ---- That was my question. Not a medical examination. There was no evidence. The answer to the question is we had. That's not part of the certification process to ensure the physical and mental fitness of foster parents? Based upon interviews, there's an annual certification and recertification process in which the foster family agency meets with interviews of both the foster parents, takes a look at the home to determine that it's a fit and safe place for the children. Specifically, there is no requirement that a doctor's verification as to the mental and physical fitness of the foster parents is applicable. There is no standard that requires that. Rather, the standard in this case is to meet with the foster parents and determine whether or not they seem to be physically and mentally capable of fulfilling their duties. There is no evidence in this case that there was a deterioration that was known to us of Mr. Coy's mental health. The record is devoid of any such evidence to that effect. What the record does reveal, though, in one of our undistributed material facts, is that Barbara Coy acknowledged, this is the wife of Hank Coy, acknowledged that if there was a decline in the health of her husband, that she should report that to us. And she did not because she herself did not observe any decline in his mental health. Why did she have a cane? Do you know? She, yeah, she did not walk well. He was... Right, but do you know what her medical condition was? I mean, I've met her, I've seen her, but I can only represent based upon my own observations that it appeared to be some type of orthopedic issue, which limited her mobility to some extent. Wouldn't that be some concern given the number of kids that were going to be placed there? It would not be a concern that would cause one to think that there could be a sexual assault. No, no, I'm just talking about placement. Not necessarily, Your Honor. I would rather have someone who's experienced as a foster parent, has a, in this case, an eight-year record of caring well for children. Seventeen foster children were in the home prior to these children being placed there. I think it's acceptable to have a person with some degree of physical limitations if they have a track record of caring for the children as well. Why would opposing counsel say that Mrs. Coy admitted that her husband was one year into Alzheimer's? Where would that have come from in the record? It's not, I do not believe it's before the court. There may have been some reference, I don't know, Your Honor. There may have been some reference in her deposition testimony to that effect. I can't state definitively yes or no. There may have been. If there was, I believe the record is completely devoid of any evidence that that was conveyed to VA. In fact, again, I will go back to the undisputed material fact that I referenced earlier, which is she stated that if there was a decline in her husband's mental health, she knew she was obligated to report that to us, and she didn't. That leads me to believe that the evidence that Your Honor just stated wasn't before the court. Your Honor, I would like to talk briefly about the September 11, 2003, incident in which one of these young girls was, according to the record, suspended from school. Hank Coy came to school to pick her up, and her response was allegedly to kick and perhaps spit at him. The record will show that Barbara Coy conveyed at least to Judy Olivera, the EA social worker, that there was kicking by this young girl of Hank Coy. And Barbara Coy, not Judy Olivera, but Barbara Coy's deposition states through a hearsay statement that Judy Olivera said that seems to be perhaps an indication that there may have been a sexual molestation at some point. What is missing from the record, which is a critical point that the district court placed a great emphasis on, there is no evidence that the social worker, Judy Olivera, had even the faintest hint of a suspicion that there was any molestation that occurred in this foster placement. The district court stated, I think succinctly, that it's understandable that foster children in foster homes are necessarily going to be engaging in a variety of acting out volatile behavior. That's the reason that they're in foster care to begin with. Not these kids. Yeah. No, no, I mean these kids weren't put in foster care because they were volatile. No, they come from an abusive situation. Maybe neglectful. Neglectful, where it's not unexpected that they will have acting out behaviors. What the district court emphasized was that if the obligation on the part of a social worker for a foster family agency is to file a suspected child abuse report or to terminate placement each and every time that a child in foster care acts out at school or against a foster parent, the foster care system would be unmanageable. The district court went on to state that they are placed in an inherently stressful and emotional situation and that if the obligation on the part of the foster family agency was to terminate the placement, it would only make a difficult situation worse and it would also burden law enforcement by having to respond to essentially unfounded, vague child abuse reports. If it's nothing more than a child was acting in an aggressive manner towards a foster parent, that would place an untenable burden on foster family agencies because they would be filing reports like that on a daily basis if that was the standard. That's why the court went back and applied the eight policy-driven factors of the Rowland case to the facts and allegations of this case and concluded that the totality of the circumstances compel the result that a duty to prevent an unforeseeable risk of harm does not attach to a foster family agency in this case. Our questions have taken you over your time. Are there any further questions of the panel? Okay. Thank you, counsel. About a minute and a half. This shows to me the very issue here is one of facts. The 4-1⁄2-year-old was suspended from school on that day because she touched another little girl inappropriately. We are discussing facts, fact-driven, fact-based reasonable behavior. And for that reason, that is why I believe this was in the purview of the jury. In the case of J.L., the grandson was not a part of that licensed agency. It was a true third party that came in, unknown to the licensing agency until the last minute. Marion Coy was not visiting this home. He was the foster father. And we had more than one time that both Terry O'Brien and Judy Olivera, who were social workers with EA, said we didn't talk to him because he was deaf. We did not talk to him because he was deaf. These factors are fact-driven. Those are the kinds of reasonable response, the kind of reasonable behaviors, the kind of reasonable assumption of duty that we would expect a jury to determine. And that's why I believe the judge went far beyond what he was to do in this matter. He was to determine if there was a duty, and the rest was to be left to the jury. Sotomayor, could you briefly address the sanctions? I'm just curious about why you thought the district court abused his discretion. Because there was no notice, and because we ---- I'm sorry. I didn't hear you. There was no notice that he was going to make a determination of bad faith. We did ---- there was no notice in that hearing. And that hearing, keep in mind, was not a multiplication of hearings. That hearing was brought by a motion in limine by the defendants, and we were responding to that, that motion. Well, in all fairness, there had been ---- this was not the first time the issue of the letter had arisen in the litigation. Yes. That's the first time it had been raised before the court. I apologize. Before it had only been in deposition. It was merely listed as an exhibit on the joint pretrial statement. And at that point, defendants said, well, I don't want to wait until trial to make this determination. I'm going to go ahead and file a motion in limine and ask for a special hearing, and we agreed with that. I think the district court noted in its ruling that the attorneys had been warned several times that the authenticity of the letter was questionable. But not by the court. Not by the court. Well, it doesn't matter if it's by the court. If the parties, if the other party put you on notice that the letter was not what it purports to be and you persist in relying on it, the court can take that into consideration. We understood there would be an argument with regard to getting it into evidence because of the authenticity. We absolutely knew that. And the fact is, is, though, that was the first time ever that the court was hearing that matter. There was, there had never been a dispute before the court did. Why did you withdraw it? I, they withdrew it because they could not go forward with the theory that they believed would give it authenticity, that is, truthfulness. They had the witness there who would testify to it. And the court would not allow them to inquire as to truthfulness. I'm not stating that. Well, no, what the court said is, I'm not going to hear evidence on the content. I just want to know whether the letter was authentic. Correct. And they were going to try to prove the authenticity of the letter by the truthfulness of the statements. It doesn't make any difference, though, does it? Why would it make any difference to say? I mean, if you're going to have the truth, you put in the, I mean, if you want to talk about the content, you have somebody testify with the content. You wanted to get in the letter, and that has to be authentic. It doesn't matter if it's all true. How, how, how, I don't understand why. I'm not saying. I'm not in a position. Let me put it this way, let me put it this way. How, I think you can understand the court's frustration when it's just trying to apply the rules of evidence to whether or not that comes into evidence or not. I can understand the court's frustration. However, it's the difference between whether or not it was a bad faith issue or it was simply a mistake. Or reckless. One was wrong. It could be reckless under Section 1927. I believe that you would have to determine then still that they were going forward with some reckless disregard, that they were not just simply wrong. They believed that they could put everything that was in that letter in because, number one, it was a business, because it was a business document, and because it was admission against interest. So when they started to ask the questions about. That doesn't authenticate. Admission against interest does not authenticate a document. You're exactly correct. Where did you get the letter? The letter was sent two times anonymous to the office, to our offices. Lassen County is a small county. I used to practice there. A lot of people, you know, communicate with me. The other way was the supervisor of Terry Chapman's social worker provided a copy of that letter to our office after she was terminated. That's how they received it. Was there any talk about how she got it? Yes. She said she had a copy because it was on the computer at the office. And that was a statement between us. She didn't receive it. Well, I mean, the whole. What struck me looking at the hearing is that you, and I use the term broadly, seem to include the entire defense team, but seem to concede, well, we know it's not authentic. We're just taking a flyer on it. Or at least that we had no hope of getting it into evidence by traditional means. Because otherwise, you would have said, get us continuance. We'll get somebody who can say this is an authentic letter. I mean, and I can understand when the court has prepared very hard for a hearing and you're on notice that there are expert testimonies saying it's not authentic, the person who drafted it says it's not authentic, that the court may have expected more and therefore felt that persisting in the view, persisting after being on notice of all of that was enough. So why wasn't it? As I said, the counsel, Mr. Hager and Mr. Edwards, believed that the document was true because of the deposition of Terry Chapman himself. They asked him, is this statement true? Is this statement true? Is this statement true? Did they ever ask him, did you write this letter? They did ask him. He said no. It was his signature. And they said it was his signature. He said he didn't write the letter. They said, well, you're not willing to admit that today. Yes, I'm not willing to admit that I wrote that letter today. Yeah. So they denied it was authentic. They did. And you had no proof of authenticity. You had proof perhaps that the events were true that were portrayed in there. That's all. Right. Okay. Any further questions? Very good. Thank you. The case is ordered to be submitted for decision. It will be in recess for the afternoon. All rise.
judges: Carney, Thomas, Rawlinson